**RECEIVED**

**JUN 07 2011**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Justin Ray Sparlin

(Enter above the full name
of the plaintiff or plaintiffs in
this action)

vs.

LaSalle County Jail
LaSalle County
City of Ottawa
Thomas Templeton
Justin Rick
Susan Darif
Stephen Cullinan
Sgt. Preci
Cpl. Edgcomb

11 C 3875
Judge Matthew F. Kennelly
Magistrate Judge Jeffrey T. Gilbert

)

(Enter above the full name of ALL
defendants in this action. Do not
use "et al.")

**CHECK ONE ONLY:**

X  **COMPLAINT UNDER THE CIVIL RIGHTS ACT, TITLE 42 SECTION 1983**
   **U.S. Code** (state, county, or municipal defendants)

_____  **COMPLAINT UNDER THE CONSTITUTION ("BIVENS" ACTION), TITLE**
   **28 SECTION 1331 U.S. Code** (federal defendants)

_____  **OTHER** (cite statute, if known)

*BEFORE FILLING OUT THIS COMPLAINT, PLEASE REFER TO "INSTRUCTIONS FOR*
*FILING." FOLLOW THESE INSTRUCTIONS CAREFULLY.*

**I.   Plaintiff(s):**

   A.   Name: __Justin Ray Sparlin__

   B.   List all aliases: __None__

   C.   Prisoner identification number: __M06163__

   D.   Place of present confinement: __Western Illinois Correctional Center (WICC)__

   E.   Address: __2500 Rt. 99 South        Mt. Sterling, IL        62353__

   (If there is more than one plaintiff, then each plaintiff must list his or her name, aliases, I.D. number, place of confinement, and current address according to the above format on a separate sheet of paper.)

**II.   Defendant(s):**
   (In **A** below, place the full name of the first defendant in the first blank, his or her official position in the second blank, and his or her place of employment in the third blank.  Space for two additional defendants is provided in **B** and **C**.)

   A.   Defendant: __Thomas Templeton__

        Title: __Sheriff of LaSalle County, Chief Jailer and administrator of County Jail__
        Place of Employment: __LaSalle County Detention Facility__

   B.   Defendant: __Stephen Cullinan__

        Title: __Medical doctor who has a contract with the LaSalle County Jail to provide medical services to the inmates one day per week.__

        Place of Employment: __LaSalle County Detention Facility__

   C.   Defendant: __Susan Darif__

        Title: __Cpl Darif, Supervisor at the county jail__

        Place of Employment: __LaSalle County Detention Facility__

   (If you have more than three defendants, then all additional defendants must be listed according to the above format on a separate sheet of paper.)

2

XXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXX _____

XXXXXXXXXXXXXXXXXXXXXXXXXXXX _____

XXXXXXXXXXXXXXXXXXXXXXXXXXX _____

XXXXXXXXXXXXXXXXXXXXXXXXXX _____

XXXXXXXXXXXXXXXXXXXXXXXXX _____

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXX)

**II.    Defendant(s):**
(In **A** below, place the full name of the first defendant in the first blank, his or her official position in the second blank, and his or her place of employment in the third blank.  Space for two additional defendants is provided in **B** and **C.**)

XXX **D. Defendant:**   Justin Rick _____

Title: _____ Corrections Officer at LaSalle County Detention Facility

Place of Employment:   LaSalle County Detention Facility

XXX **E. Defendant:**   Cpl. Edgcomb _____

Title: _____ Cpl. Edgcomb, Supervisor at LaSalle County Detention Facility

Place of Employment:   LaSalle County Detention Facility

XXX **F. Defendant:**   Sgt Preci _____

Title: _____ Sgt. Preci, Grievance officer, oversees Cpl.'s and C/O's.

Place of Employment:   LaSalle County Detention Facility

(If you have more than three defendants, then all additional defendants must be listed according to the above format on a separate sheet of paper.)

Revised 9/2007

XXXXXXXXXXX XXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXX

**II.    Defendant(s):**

(In **A** below, place the full name of the first defendant in the first blank, his or her official position in the second blank, and his or her place of employment in the third blank. Space for two additional defendants is provided in **B** and **C**.)

XXX **G.** Defendant: <u>LaSalle County Jail (LaSalle County Detention Facility)</u>

Title: _____

Place of Employment: _____

XXX **H.** Defendant: <u>LaSalle County</u>

Title: _____

Place of Employment: _____

XXX **I.** Defendant: <u>City of Ottawa</u>

Title: _____

Place of Employment: _____

(If you have more than three defendants, then all additional defendants must be listed according to the above format on a separate sheet of paper.)

2

Revised 9/2007

**III.** **List ALL lawsuits you (and your co-plaintiffs, if any) have filed in any state or federal court in the United States:**

A.   Name of case and docket number: _____ N/A _____

_____

B.   Approximate date of filing lawsuit: _____ N/A _____

C.   List all plaintiffs (if you had co-plaintiffs), including any aliases: ____ N/A _____

_____

_____

_____

D.   List all defendants: _____ N/A _____

_____

_____

_____

E.   Court in which the lawsuit was filed (if federal court, name the district; if state court, name the county): _____ N/A _____

F.   Name of judge to whom case was assigned: _ N/A _____

G.   Basic claim made: _____ N/A _____

_____

_____

H.   Disposition of this case (for example: Was the case dismissed? Was it appealed? Is it still pending?): _____ N/A _____

_____

_____

I.   Approximate date of disposition: _____ N/A _____

**IF YOU HAVE FILED MORE THAN ONE LAWSUIT, THEN YOU MUST DESCRIBE THE ADDITIONAL LAWSUITS ON ANOTHER PIECE OF PAPER, USING THIS SAME FORMAT. REGARDLESS OF HOW MANY CASES YOU HAVE PREVIOUSLY FILED, YOU WILL NOT BE EXCUSED FROM FILLING OUT THIS SECTION COMPLETELY, AND FAILURE TO DO SO MAY RESULT IN DISMISSAL OF YOUR CASE. CO-PLAINTIFFS MUST ALSO LIST ALL CASES THEY HAVE FILED.**

Revised 9/2007

## IV.    Statement of Claim:

State here as briefly as possible the facts of your case. Describe how each defendant is involved, including names, dates, and places. **Do not give any legal arguments or cite any cases or statutes.** If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. (Use as much space as you need. Attach extra *sheets* if necessary.)

I was booked into the LaSalle County Jail on or about March 29, 2008 on a sex charge. After being booked in I was walked directly to an Isolation cell and remained in that cell and several other isolation cells until the day I left that facility 15 months later. I was never in violation of any rules at that facility, I wasn't placed in isolation for disciplinary reasons, I was never in front of any disciplinary boards, I went from booking directly to isolation. I was never once placed in General Population, GP.

You might be thinking that because I was in on a sex charge that the facility was holding me in isolation for "protective custody" reasons but this would be nonsense. The county jail facility is a newly built modern jail with approximately 15 blocks or "pods" as they are sometimes called. The total inmate capacity is roughly 200-250 inmates. Being a modern jail, it is ran by modern standards and has an "S.O. Pod" or Sex Offender Pod for persons currently charged with a sex crime or for persons who have been convicted of one in the past. Most every jail in the nation has an S.O. Pod and it is meant to be used to house persons in a protective custody fashion knowing that persons charged or previously convicted of sex crimes tend to be viewed as the scourge of the inmate population and singled out for harassment and sometimes violence. It's also a common practice to place any person deemed to be "vulnerable" onto one of these S.O. Pods. So to say that I was being held in isolation for protective custody is nonsense whenever the whole point of an S.O. Pod is for protective custody.

Regardless of their reasoning I was locked in Isolation from March 29, 2008 until I was released and transferred to Stateville NRC on July 02, 2009, approximately 15 months later. It sounds like a minor issue but the documents attached to this should help to prove to you that being "locked up in isolation" doesn't mean you sit in isolation twiddling your thumbs waiting for your next court date. It sounds nice but this just isn't the case. A better view is one where a person is locked in a cell with a frosted window so you can't see outside, a tiny window on the door less than 1 foot square, a fluorescent light on you 24 hrs a day, virtually no contact with anyone else, severely restricted movement, and basically you just sit in that room and go insane. Never in my life have I ever hallucinated like how I was in that isolation cell. It was non-stop, every hour of every day.

I had just returned from Iraq about 3 months before being arrested. The crime I was arrested for happened 1 month after returning from Iraq. I was

Revised 9/2007

suffering from a lot of mental health problems after returning and had been seeking out mental health care prior to my arrest. Additionally I do have a long history of mental health problems dating back to when I was 13.

It's not a good idea to lock up a person with mental health problems or with a history of mental health problems in an isolation cell. It's never a good idea. What happens is what happened to me, I deteriorated so much and so far that the psychiatrists at Stateville NRC were preparing to send me to a prison psychiatric hospital.

What made things worse was that the Dr. at the LaSalle County Jail was refusing me mental health care. He knew I was suffering from mental health problems and deliberately and intentionaly refused to prescribe me any type of medication to help alleviate the suffering. I wrote grievances to Thomas Templeton, the Chief Jailer, and only then did the Dr. presribe anything and even then he only prescribed a drug not used for depression and in a dosage that's less than recomended and for a less than adequate treatment period. Also, I think it's important to know that this Dr. isn't even a psychiatrist. He's just a family practitioner from the local community that has a small contract to provide medical care to the inmates 1 day a week. He doesn't know anything at all about mental health care.

I deteriorated bad, I'm only now 2 years later starting to make a full recovery.

What I am writing to you about isn't unexplored territory. What it breaks down to is an Eighth amendment, cruel and unusual punishment, and a 14th amendment, fair and equal treatment, and an argument could perhaps be made along the lines of access to the courts or a due process violation if it can be shown that this apocryphal treatment caused me to somehow be deprived of due process due to a severely degraded mental state. These last two might be pushing things a bit but the first two, 8th and 14th amendment violations are very easily established.

So substantively the argument is:

1.) I was denied proper mental health care

2.) There was no mental health staff available

3.) The nurse and corrections officers weren't properly trained to identify and work with inmates with mental health problems

4.) There were no procedures set up to deal with mentally ill inmates

5.) The reckless use of the isolation cells caused me further harm

6.) The use of the isolation cell was without a legitimate purpose and deprived me of my 14th amendment right to equal treatment under the law

7.) My phone use was restricted while in isolation while none of the other inmates in the jail facility were placed on equal restrictions

8.) The jails Dr. failed to do any type of investigation into my mental health history after learning that I have had past mental health problems

9.) The jails Dr. deliberately chose not to provide me with any kind of adequate mental health treatment after learning that I was mentally ill.

Revised 9/2007

On this page I am going to list all of the defendants and how they all tie into this case.

**LaSalle County Jail**
This is where all of the violations occured.

**LaSalle County**
LaSalle County is who funds and supports the LaSalle County Jail

**City of Ottawa**
The LaSalle County Jail is located in Ottawa. The City of Ottawa has an added responsibility of ensuring that this facility is operating in compliance with the laws and prevailing norms in detention practices. They have city health inspectors for the local hospital and restaurants building inspectors, sewage and water inspectors, you would think that the city would want to check in on a facility such as this one as well.

**Thomas Templeton**
Templeton is the administrator of the county jail. I wrote to him often about the problems I've mentioned and he failed to ensure that these problems were fixed

**Justin Rick**
Justin would not allow me to use the phone while not restricting other inmates use of the phone

**Susan Darif**
Susan was a Cpl. at this facility, a supervisor. She was in a position of authority and added responsibility and seems to think it's a "trivial matter" when it comes to violating not only a persons constitutional rights but also a persons basic needs.

**Stephen Cullinan**
This is the Dr. that refused me mental health treatment.

**Sgt. Preci**
Sgt. Preci was also very much aware of what was happening at this facility. He was in fact the person who was telling the Cpl's to keep me in Isolation.

**Cpl. Edgcomb**
Cpl. Edgcomb was a supervisor at this facility. She was the senior supervisor on staff. She was also telling the rest of the corrections officers to keep me in isolation. Not only this but being the supervisor she would have been responsible for ensuring that all of the grievances were taken care of properly, which they weren't.

There are a lot a attachments after this page that I've included to try and help show that this is a much more serious issue than it is just a gripe. Isolation is no joke. It can break down the strongest man from being "okay" to the edge of insanity in months. It's a tool, or device that should be used cautiously and with respect and if it is used there should be a properly trained staff on hand to help deal with the inevitable consequences of its use. The majority of what else I've attached is mental health records detailing the problems I've suffered from prolonged detention in Isolation. There are some other attachments as well. It's probably a little more than what's necessary Revised 9/2007 but I'm including it to try and make certain I get past the first hurdle getting approved.

**V.    Relief:**

State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.

Since I've already been released from LaSalle County Jail and since the damage has already been done and since I am still trying to recover from the damages caused by my treatment at this facility, all I can ask for is a financial settlement, the amount of which shall be determined either through arbitration or by a jury.

Also, one last thing... I don't think I've made it previously clear but the date I left this county jail was July 02, 2009. That is the date the statute of limitations would have begun on.

**VI.**    The plaintiff demands that the case be tried by a jury.    ☒ YES    ☐ NO

**CERTIFICATION**

By signing this Complaint, I certify that the facts stated in this Complaint are true to the best of my knowledge, information and belief. I understand that if this certification is not correct, I may be subject to sanctions by the Court.

Signed this __17__ day of __May__, 20__11__

_(signature)_
(Signature of plaintiff or plaintiffs)

Justin Ray Sparlin
(Print name)

M06163
(I.D. Number)

2500 Rt. 99 South
Mt. Sterling, IL    62353

(Address)

6

Revised 9/2007

What follows are grievances and letters about my phone usage at that county jail facility. After being placed in isolation the jailers, with Sgt Preci's permission, began regulating my phone usage in a way that wasn't consistent with how the other inmates were being treated in thier use of the phone. It's a 14th amendment issue. Why can everyone else use the phone and not me? It sounds like a minor issue but it really can drive a person crazy when you have important calls to make and the jailers are having fun turning your phone on and off. Not to mention that I was already half crazed to begin with. This didn't help matters much.

I wrote this grievance to Sgt Preci on 23 July 2008, one day before my final pre-trial hearing. I needed to speak to one of my attornies prior to any plea offers or any other considerations the following day. I needed his advice about how to proceed. Because how the phone system works at that county jail I wasn't able to call him which is why I wrote the grievance and asked for assistance in being able to contact him. By Illinois State law I am supposed to be allowed to call my attorney.

What I wrote on the right is: I need to speak to my attorney about important legal business. Can you make arrangements for me to speak with him? His phone does not accept collect calls. His # is 254 287 4360. His name is Captain Gilbert.

Cpl. Darif responded the same day with: No, it is not our responsibility to contact your attorney. Write him a letter.
signed by,
Cpl. Darif

**LASALLE COUNTY SHERIFF'S OFFICE JAIL & CORRECTIONS DIVISION**

To
___ Chief Jailer    Date ____
_X_ Sergeant
___ Officer
___ Investigator
___ Other

From J. Abernethy (Print your name)   Block ___ Cell No. ___

Type of Request (Place X as appropriate line and explain in remarks)
___ Public Defender
___ Attorney
___ Medication (Explain nature of illness)
___ Clothing for court
___ Minister/Priest
___ Wish to be made trusty
___ Speak to you
_X_ Other: See Remarks

REMARKS: (Must be printed. Explain Request)
I need to speak to my attorney about important legal business. Can you make arrangements for me to speak with him? His phone does not accept collect calls. His # is 254 287 4360. His name is Captain Gilbert.

DO NOT WRITE BELOW THIS LINE
No, it is not our responsibility to contact your attorney. Write him a letter.
NOTE FROM PRISONER

LASALLE COUNTY SHERIFF'S OFFICE
JAIL & CORRECTIONS DIVISION

To _____                          24 July, 2008
    Chief Jailer           Date _____

_____ Sergeant

_____ Officer _____

_____ Investigator

_____ Other
                  Block _____

From _____            Cell No. _____
    (Print your name)

Type of Request ( Place X on appropriate
              line and explain in remarks)

_____ Public Defender    _____ Attorney _____

_____ Medication (Explain nature of illness)

_____ Clothing for court    _____ Minister/Priest

_____ Wish to be made trusty    _____ Speak to you

__X__ Other: See Remarks

REMARKS: (Must be printed. Explain Request.)

_____

DO NOT WRITE BELOW THIS LINE

_____

NOTE FROM PRISONER

_____

*Mr. Sparlin that I would not be running down the hall for trivial matters such as this again & that he needs to be very specific in future communications*

*(MSM)*

This photocopy didn't turn out too well so it's hard to read what I wrote. It is essentially along the same lines as the grievance from the day before about not being able to use the phones.

What Cpl. Darif wrote in response is:

Spoke w/Sparlin 1020 hrs. He asked if that was my signature on his grievance dated 7/23/08 & I replied that it was. He then asked if Sgt. Preci had seen it & I replied I had made a copy of it & given it to him. I then told Mr. Sparlin that I would not be running down the hall for trivial matters such as this again & that he needs to be very specific in future communications.

> signed by,
> Cpl. Darif

That's just great. I think that Cpl. Darif summed up her whole attitude along with all of the other defendants' attitudes with that last sentence. It's just a trivial matter. Being deprived of my constitutional rights and being locked up in isolation for no good reason and being treated worse than most animals is just a trivial matter.

LaSalle County Correctional Center
707 East Etna Road
Ottawa, Illinois 61350

Given Response
on ~~~~~

NoT HAPPY

Chief Jailer Thomas Templeton

Inmate Incident Report
## LASALLE COUNTY SHERIFFS OFFICE

DATE   03/22/2009
TIME   01:49:35PM

Page 1 of 1

# SPARLIN, JUSTIN RAY

Intake Date   03/30/2008

Social Security Number   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         Race/Sex   W / M         Date Of Birth

Booking Number:   39566         Jacket   115433         Current Cell   E-202

| Date | Time | General Comment | Classification | Officer |
|------|------|-----------------|----------------|---------|
| 03/22/2009 | 13:41 | PHONE USE | INFORMATION | HIGH, JUSTIN |

Type Of Force:   NO ACTION AT THIS TIME ()         Cell:

On the above date and time, Inmate Sparlin was out for his hour from 1300-1400 hrs. He used the phone in E-Block we were dishing out and demanded to use the phone in D-Block. I told Inmate Sparlin no, and told him he would have to wait until the phone was fixed which would likely be monday. He then said, "well i'll call the corporal and ask her". I told Sparlin no that I would not call the corporal. He then said "well I need to use the phone right now", and I informed him that he would have to wait until the phone was fixed. That did not seem to satisfy Inmate Sparlin and he continued to argue that he needs to use the phone in D-Block. I informed the inmate that I was not going to argue and the conversation was over.
Nothing further to report

408 - 03/22/2009 1:49:03 PM

This is how Justin Rick ties into this lawsuit. It's another issue about my being allowed to use the phones like everyone else at that county jail. Everyone was allowed to use the phone but me. It's a 14th amendment issue, fair and equal treatment. There was a real simple solution and that was to allow me to use the phone downstairs in D-Block. It's a very small county jail that is only built to accomodate 200~250 inmates. Going downstairs to D-Block isn't a difficult thing to do. It's literally right below E-block where I was housed in Isolation. 2 officers monitor 5 Blocks or Pods as they are sometimes called, 5 on this side of the hall, 5 on the other side of the hall and a few more pods down the hall. "Going downstairs" means walking down from E-Block, which is like a Tier or second floor mezanine, and right directly across from the Pod officers desk is another phone. Nothing complicated or difficult about it.
So right from the start there is a 14th amendment violation for having me locked up in isolation for almost a year when this Inmate Incident Report was written, and then not allowing me to use the phones like everyone else is another 14th amendment violation.

Good grieve is isn't the phones I've never had a problem with this before until recently but its very unnerving. Again I can't get a straight answer out of anyone so I have to ask you. Don't you run this facility I'm assuming you have the answer to this.

In the rule book it states that the phones will be turned on after morning cleanup. It doesn't state when they will be turned off though. And that's where all the problems begin because every single jailer has a different time for turning off the phone. Tonight it was 6:30. Last night it was 8, last week it was 9. So what exactly is the standard in this facility?

Justin Sperlin

The phones are turned on & off at the pod officer's descresion.

6/11/08
Per Sgt. Preci,
The phones are turned on & off at the pod officers discretion.
signed by,
Cpl. David

This is another issue with not being allowed to use the phones. My phone use was restricted while everyone else was allowed to use the phones.

These are just a couple of the letters I've written to the Chief Jailer,
Thomas Templeton, about various issues and is also the reason why he is included
in this lawsuit. I wrote letters and grievances to the Chief Jailer and I
was always rebuffed by him. Usually his go-between man Sgt. Preci would reply
through Cpl. Darif. I don't know how exactly the structure worked but at
the end of the day he was responsible for how that county jail was being run,
he was made aware of the problems and he did nothing to fix the problems that
were brought to his attention and never did a follow up to make certain that
the problems were fixed.

Dear Mr. [redacted]

I have a couple of grievances I would like to air to you.

First one is about the Illinois County Jail Standards — I want to look at a copy and become better acquainted with the minimum standards and the rights I have at this facility. According to the rule book given to me at booking, I only had 7 rights!

I have asked to look at this book twice, both times the response either refused or blew it off. I don't know which since she never replied. In such a tightly controlled and regulated environment where my life is practically run by that book, I think it is fair to say that I should at least be allowed to read what is in that book. It's probably even written in there somewhere that I be allowed to look at it if asked.

I can't see how not when if I ask 3 different jailers the same question and I get 3 different answers then how am I to know what is true around here without being able to consult with the manual?

[signature]
Justin Spade[...]

[margin note:]
9/14/08
Per Sgt. [...]

We do not furnish inmates with copies of the jail standards. [signature]

signed by:
Cpl. Davis

Mr. Templeton,

I'm not sure you're too done around with the out I... of top dancing will you and your staff.

725 ILCS 5/103-3

Right to Communicate with Attorney and Family; Transfer
103-3 Right to communicate with attorney and family; transfer. (a) Persons who are arrested shall have the right to communicate with an attorney of their own and a member of their family by making a reasonable number of telephone calls or in any other reasonable manner. Such communication shall be permitted within a reasonable time after arrival at the first place of custody.

725 ILCS 5/103-4

Right to Consult with Attorney
103-4 Right to consult with attorney. Any person committed, imprisoned or restrained of his liberty for any cause whatever and whether or not such person is charged with an offense shall, except in cases of imminent danger of escape, be allowed to consult with any licensed attorney at law of this state whom such person may desire to see or consult, alone and in private at the place of custody, as many times and for such period each time as is necessary.

→

## ~~INTRODUCTION~~

~~The LaSalle County Detention Facility operates on two (2) key rules:~~

1. Staff and inmates work and live in a safe environment.
2. The Sheriff expects good behavior and common sense from inmates.

- The Facility will provide you with a safe living space during your time here.
- Your duties during your stay are to follow the rules and regulations and to cooperate with staff at all times.
- Good behavior allows you to have privileges.
- Bad behavior causes you to lose those privileges and will result in disciplinary action and/or criminal charges.
- The information contained in this handbook will help you during your stay. Know and follow the rules and you will have a "Hassle Free" stay.

## IMATE RIGHTS

1. ~~You have the right to receive fair and humane treatment.~~
2. ~~You have the right to know the rules and procedures that affect you, and the penalties for not following the rules.~~
3. You have the right to freedom of religion.
4. ~~You have the right to adequate medical, dental and mental health care.~~
5. You have the right to adequate nutrition.
6. You have the right to correspond with all persons and agencies, unless legally limited.
7. You have the right to reasonable visitation and telephone contact with your attorney(s).

~~Your rights are protected by law and cannot be taken away from you.~~ However, it may become necessary to modify your rights to ensure the rights of all inmates and the safety and security of the Facility.

All services and functions not listed, as Inmate Rights are Inmate Privileges. You keep your privileges by good behavior. Bad behavior will result in the loss of privileges.

## EXPECTED INMATE BEHAVIOR

You are expected to follow our rules and regulations and behavior guidelines while you are in the Facility. We expect that you will:

1. Follow all rules and regulations.
2. Follow all staff directives and requests.
3. Respect the Facility's property and property of others.
4. Keep your assigned cell and common pod area in a clean, orderly and sanitary fashion.
5. Maintain daily personal hygiene: shower and brush your teeth daily.

## NO SMOKING

The LaSalle County Detention Facility is completely smoke free. The no smoking policy applies to all staff, visitors and inmates.

This policy includes the use of all tobacco products, such as: chewing tobacco and snuff.

Anyone found with any type of tobacco product is subject to disciplinary actions.

Inmates are not allowed to smoke while at court, on transports outside the Facility or while working outside the Facility.

Sparlin, J.

LASALLE COUNTY JAIL
707 E ETNA ROAD
OTTAWA, IL 61350
MEDICAL DEPT
815-434-8249
FAX 815 434-0554

This is the fax coversheet
that was sent from the nurses
station to Dr. Chapman requesting
a copy of my psychiatric records.
Notice the date is Aug 6, 2008.

TO: Dr. R. Chapman

FAX NO: 1-309-454-5770

FROM: Dr. Cullinan - LaSalle Co. Jail

DATE: 8-6-08

TOTAL NO. OF PAGES: 1 + Cover

RE: Release of information

Faxed
8/6

08/06/2008 04:19 3094545770 ROBERT E CHAPMAN PAGE 01

# ROBERT E. CHAPMAN, MD SC
## P.O. BOX 1404
## BLOOMINGTON, IL 61702-1404
### PHONE: 309/454-2205
### FAX: 309/454-5770

*Dr. Chapman responded promptly with the request and sent the report to the nurses station the same day.*

TO: _Dr CULLINAN_                    FROM: _REC_

FAX NUMBER: _815 434 0554_          DATE: _~~6 Aug 08~~_

PHONE NUMBER: _____      NO PAGES _5 + cover_

RE: _Justin Sparlin LaSalle Co 08-CF-76_

Notes: _____

(1) Please Take note of my current
Mailing Address and correct your
records.

(2) Please find requested Medical Records

The next 3 pages are from the psychiatric evaluation that was faxed to the county jail 08/06/2008 from Dr. Chapman. The report makes it very clear that I've had a long and significant history of having mental health problems and that depression has been a long-standing issue and that I was suffering from depression at the time he wrote that report. I was actually on anti-depressants before I got arrested but that prescription was canceled whenever I was booked into the LaSalle County Jail.

What's important about that report is that it shows that I've had a long history of mental health problems and that I was mentally ill at that time. The Dr. and the nurses read that report and still refused me any kind of mental health treatment. It's important because in a lot of the Eighth Amendment suits this has always been one of the criteria that's been looked at, whether or not they were aware of any problems or if they had knowledge of past mental health problems. Another issue that's been looked at was whether or not an investigation was done into an inmates past mental health problems after learning of such problems. No investigation was done in my case.

After this report was faxed to the nurses station more than a month had passed when I finally realized that the Dr. wasn't going to prescribe me any medications and that is when I started writing the grievances. He only wrote the prescription because I wrote the grievances. He was basically just trying to shut me up. He wrote me a 3 week prescription for a drug not even used for depression.

What this helps to show is deliberate indifference and wantonness a key criteria when trying to settle one of these suits.

Iowa, Kansas and Germany. JRS was the middle of a sibship of three, his youngest brother is a half-brother. ████████████████████████████████████████████████ At age fifteen, while in high school, JRS got a girl pregnant (now his present wife Jennifer) ██████████

His father visited JRS when he was twenty years old and that was the first contact he had with him since he was five years old. His father is fifty-one years old, **"alcoholic and in stage 3"** with multiple organ diseases. He has no known history of psychiatric disorder. He lives in southern Illinois and is on Social Security Disability and was a truck driver.

His mother is fifty years old and in remission from lung cancer. She works in a factory in Ottawa and was divorced from JRS's stepfather father in 2004. She is divorced and has a boyfriend that lives in. She does not have a history of drug or alcohol abuse. JRS's nine-year old half-brother lives with his mother.

SCHOOL HISTORY: He graduated from high school in 1997 in Iowa.

Grade school (K-6th): JRS said he attended seven different grade schools because his stepfather was in the military. He said, **"I never got a chance to adjust and never had time to make friends"**. He said his grades were **"okay"** and he was not held back. He denied any discipline problems saying, **"I stayed to myself"**.

Junior high school (7th-8th): JRS said things changed in junior high school. He was in the same school for both years. He said he did okay in his studies and was on high honor roll and made friends. However, in the middle of eighth grade he began not having any interest, ~~became depressed~~, started cutting classes, received detentions for skipping classes, caused class disturbance and gradually his grades slipped and he stopped caring.

High school (9th-12th): He first attended a public school and then his grades continued to suffer. He said he had difficulty concentrating and focusing because of his personal life ███████████ ~~in the eleventh~~ ~~grade~~████████████████████████████████ was transferred to a mental ~~health~~██████████████████████████████████ Iowa for six months██████████ moved ~~to a group home in Des Moines, Iowa for six months and then back to~~██████████████ back to public school for his senior year.

PSYCHIATRIC HISTORY: JRS said at fourteen when he got a girl pregnant and she had the baby (the victim in this cause) that he did not marry until 2006 ██████████████████████████████████ ██████████████████████████████████ when he was considered to seek care from a psychiatrist given ██████████. He was diagnosed with attention deficit disorder. He said he was abusing drugs and under considerable stress at home.

~~Not only was I diagnosed~~ with attention deficit disorder, I was also diagnosed with Paranoid Schizophrenia, Chronic Major Depression, Anti-Social personality disorder and few other things. I don't recall everything and I don't have the paperwork in front of me. Notice ████ in the next paragraph the Dr. writes that I was "treated with multiple types of psychotropic medicines including anti-psychotics and anti-depressants..." You don't treat Attention Deficit disorder with anti-psychotics and anti-depressants.

04:19    3094546770          ROBERT E CHAPMAN                    PAGE  05

~~With the~~ ~~dental Health Institute he attended school.  He was treated with~~ ~~multiple types of psychotropic medicines including anti-psychotics and anti-depressants.  He claimed~~ ~~none were helpful.~~

~~He had follow up care at the psychiatric department at the University of Iowa in Iowa City exam for~~ ~~less than seven.  He was treated by a second year resident and was started on Depakote and Paxil.~~ ~~He discontinued the medication when he turned eighteen.  On 4 January 2008 after returning from~~ ~~military duty in Iraq he consulted the psychiatrist he had seen when he was sixteen.  He received no~~ ~~treatment but his diagnosis of attention deficit disorder was confirmed.~~

ALCOHOL HISTORY: ~~He~~ ██████████████████████████████ JRS became intoxicated at times.  He started more serious drinking at age thirteen, drinking beer and **"cheap liquor"**.  He drank continually until high school when he increased his usage with another marked increase after high school.  He had six months of rehabilitation in 1998 with good benefit leading to five-year sobriety.  He was arrested twice for public intoxication in 2006.  In the last three years he has indulged in binge drinking.  His peak use was 2004 when he drank at least a fifth of Vodka every day until he blacked out ██████████████████████████████████████████████████████████████████

WORK HISTORY: He worked in construction ███████████ factory work and in sales.  His longest job was construction work for three or four years.

MILITARY: He enlisted in the U.S. Army in 2005.  His military occupation specialty is infantry.  He went to Iraq in October 2006 for fifteen months (three tours).  He returned to the United States on leave on 3 January 2008.  He said he is currently in the process of discharge but did not know the type.

MENTAL STATUS: He was oriented as to time, place and person.  He had a good fund of general knowledge, showed above average intelligence, showed poor impulse control and judgment by hypothetical question ██████████████████████████████████████

~~He has suffered depression since age thirteen and it never left.  He said it got worse in the spring of 2007~~ ~~when~~ JRS believed it was due to the stress of his wife and how she was raising their eleven year old daughter.  His ~~depression remains~~ ██████████████

He is afraid he will act or speak aggressively when he really does not want to and he is always afraid he will lose something of importance.  He suffers a sense of underachievement, has difficulty getting organized and suffers chronic procrastination.  He has many projects going simultaneously and trouble

4

with follow-through. He has a tendency to say what comes to mind without necessarily considering the timing or appropriateness of the remark. He is easily bored, distracted, impatient and restless and has trouble going through the established channels or following proper procedure. He feels he is often creative, intuitive and highly intelligent. He has a tendency to worry needlessly, a sense of impending doom and suffers ~~severe swings and depression~~. He has a tendency toward addictive behavior, has chronic problems with self-esteem and inaccurate self-observation.

JRS'S VERSION OF THE FEBRUARY 7, 2008 TIME PERIOD: He said he was still adjusting to his return from Iraq and it had been about a month. ~~He had depression~~ and there was marital stress. He had difficulty reconnecting with his daughter and he was soon to leave for Texas and had anxiety about that. He did not want to leave and his daughter did not want him to leave. He said during that period he had to drink a six-pack of beer to get to sleep every night.

DIAGNOSIS: Adult Attention Deficit Disorder

~~Dysthymic Disorder~~

History of Substance Abuse Disorder – currently in remission due to incarceration

Respectfully submitted,

Robert E. Chapman, M.D., MBA
Diplomate American Board of
Forensic Psychiatry

REC:ph

5

**LASALLE COUNTY SHERIFF'S OFFICE
JAIL & CORRECTIONS DIVISION**

To: ~~~~~~~~~ Date: ~~~~~~~~~

_____ Sergeant

_____ Officer

_____ Investigator

_____ Other _____ Block _____

From Justin Sparlin ~~~~~~~~~
(Print your name)

Type of Request ( Place X on appropriate
line and explain in remarks)

_____ Public Defender _____ Attorney

_____ Medication (Explain nature of illness)

_____ Clothing for court _____ Minister/Priest

_____ Wish to be made trusty _____ Speak to you

_X_ Other: See Remarks

REMARKS: (Must be printed. Explain Request.)
The nurse recieved a copy of my
psychiatric evaluation a month ago and
the doctor has still not prescribed me
the medication I should be on for
2 mental disorders. Please rectify this.

DO NOT WRITE BELOW THIS LINE

Place this OR on MD

1st

NOTE FROM PRISONER

I wrote this grievance one month after the
County Jail received a copy of my psychiatric
evaluation indicating psychiatric problems.
I had been complaining about psychiatric
problems and requesting medication for months
prior to this and since they wouldn't listen
I signed a release to have my psychiatric
report faxed to them and they still refused
to put me on any meds.

What I have written to the left is:
The nurse recieved a copy of my psychiatric
evaluation a month ago and the doctor has
still not prescribed me the medication I should
be on for 2 mental disorders. Please rectify this.

This is the second grievance I wrote about the same issue one week later.

What I wrote to the left is:
It's been more than a month since the nurse received a copy of my psychiatric evaluation. The Dr. has still not prescribed me the medications for 2 mental disorders identified in that evaluation report.

**LASALLE COUNTY SHERIFF'S OFFICE**
**JAIL & CORRECTIONS DIVISION**

To ▓▓▓▓▓▓▓▓ Date ▓▓▓▓▓▓▓

___ Sergeant
___ Officer
___ Investigator
___ Other

From ▓▓▓▓ Special     Block ▓▓▓▓
(Print your name)     Cell No. ▓▓▓▓

**Type of Request** ( Place X on appropriate
line and explain in remarks)

___ Public Defender     ___ Attorney
___ Medication (Explain nature of illness)
___ Clothing for court     ___ Minister/Priest
___ Wish to be made trusty     ___ Speak to you
_X_ Other: See Remarks

**REMARKS:** (Must be printed. Explain Request)
It's been more than a month since the
nurse received a copy of my psychiatric evaluation.
The Dr. has still not prescribed me the medications
for 2 mental disorders identified in that
evaluation report.

**DO NOT WRITE BELOW THIS LINE**

_____

_____

NOTE FROM PRISONER
PLACED ON MD WD

# MEDICATION ADMINISTRATION RECORD

◆DIAMOND▶ **DIAMOND PHARMACY SERVICES**
1.800.882.6337  FAX: 724.349.2945

| MEDICATIONS | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| This is the presciption order that was finally ordered after I wrote the 2 grievances. It was only ordered because of the 2 grievances not because of any | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| concern for my | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| and as with all psychotropic drugs and as with most all drugs there is a period of time neccesary for the drug to build up in your blood stream before | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| bare minimum for any treatment with this drug. And then only a 20 day period of treatment makes this absolutely absurd. In 20 days the drug has barely | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| | Initial | Signature | Initial | Signature | Initial | Signature | Initial | Signature |
|---|---|---|---|---|---|---|---|---|
| | NL | M. Nannayan | NL | M. Nannayan | LW | Lev Cotequela, et | ML | M. Morgellan |
| | | | | | | | | B. Blinker |

DATE OF BIRTH  ALLERGIES: NKA

INMATE NAME AND NUMBER

wanton infliction of pain." This principle "establishes the government's obligation to provide medical care for those whom it is punishing by incarceration." The Court concluded that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." It is this standard that has since governed all cases of prisoners seeking to challenge the adequacy of medical care given them.

The Court gave little guidance concerning the meaning of "deliberate indifference" or "serious medical needs." It did suggest three examples of behavior that would violate the standard. First, it said that a delay could be established . . . which indifference by prison doctors . . . response to the prisoner's needs." As examples of this type of violation, . . .

. . . an inmate nurse gave the inmate an inappropriate treatment and then the doctor refused to treat the consequences,' and a prison doctor failed to follow the express

²429 U.S. at 103 (quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976)).

³429 U.S. at 103.

⁴429 U.S. at 104.

⁵The Court found that this standard was substantially identical to the standards that had been adopted by the circuit courts. 429 U.S. at n.14. The applicability of this standard to pretrial detainees is discussed later in this section.

⁶429 U.S. at 104. This rule applies to prison doctors who are state employees but are working on a contract basis. In West v. Atkins, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d (1988), the Supreme Court found that the actions of contract doctors were "state action" for purposes of the Eighth Amendment.

⁷429 U.S. at 104 n.10, quoting Williams v. Vincent, 508 F.2d 541, 544 (2d Cir. 1974) (inmate lost a large portion of [his] right ear in a fight; doctor told him "he did not need his ear" and refused to attempt to reattach missing portion, an action the court found "one would expect . . . a medical doctor to have brief"). Williams is often cited as an example of "deliberate indifference." See, e.g., Tomarkin v. Ward, 534 F. Supp. 1222, 1230 (S.D.N.Y. 1982).

⁹429 U.S. at 104 n.10, citing Thomas v. Pate, 493 F.2d 151, 158 (7th Cir. 1974), judgment vacated on other grounds, 419 U.S. 813, 95 S. Ct. 288, 42 L. Ed. 2d 39 (1974) (inmate nurse gave the inmate a shot of penicillin . . .

---

postoperative directions of the surgeon who had operated on the prisoner.

Second, the Court said that . . . establish . . . deliberate indifference . . . by prison guards . . . intentionally denying access to medical care." The Court cited eight cases that were examples of "denying" or "delaying" access. Third, the Court said a violation would be established where guards "intentionally interfered with the treatment once prescribed." Five case examples were cited.

The Court also gave examples of conduct that would not . . .

In even though the inmate was allergic; doctor, "without examining him concluded that no further treatment was needed"; See also Carlson v. Green, 446 U.S. 14, (or . . . 100 S. Ct. 1468, 64 L. Ed. 2d 15 (1980) (treatment of asthmatic with . . . and "inoperative" respirator).

¹⁰429 U.S. at 104, citing Martinez v. Mancusi, 443 F.2d 921, 924 (2d Cir. 1970) (surgeons had recommended the inmate be kept prone and be given medication for pain; prison doctor said, "he did not know of those orders").

¹¹429 U.S. at 104-105.

¹²Westlake v. Lucas, 537 F.2d 857, 859 (6th Cir. 1976) (inmate denied access to doctor for bleeding ulcer for eight days, during which he "continued to suffer and his repeated requests for medical assistance went unanswered"); Thomas v. Pate, 493 F.2d 151, 158 (7th Cir. 1974), judgment vacated on other grounds, 419 U.S. 813, 95 S. Ct. 288, 42 L. Ed. 2d 39 (1974) (a delay of 15 days in removing some sutures while the inmate was in punitive confinement caused his ear to be infected); Fitzke v. Shappell, 468 F.2d 1072 (6th Cir. 1972) (allegation of a failure to give medical attention for brain and leg injuries for 17 hours); Hutchens v. State of Ala., 466 F.2d 507, 508 (5th Cir. 1972) (denial of "medical attention and medication which both produces intolerable pain and further shortens life expectancy" for inmate with fatal cancer); Riley v. Rhay, 407 F.2d 496 (9th Cir. 1969) (alleged failure to treat tuberculosis); Edwards v. Duncan, 355 F.2d 993 (4th Cir. 1966) (alleged denial of medical care for inmate's condition recognized by doctor); Hughes v. Noble, 295 F.2d 495 (5th Cir. 1961) (denied medical attention for dislocated and fractured cervical vertebrae).

¹³429 U.S. at 105.

¹⁴Wilbron v. Hutto, 509 F.2d 621 (8th Cir. 1975) (forced to work despite hand injury); Campbell v. Beto, 460 F.2d 765 (5th Cir. 1972) (made to work in fields and denied medication, both in direct violation of doctor's orders, causing heart attack); Martinez v. Mancusi, 443 F.2d 921 (2d Cir. 1970) (prison doctor failed to follow the express postoperative directions of the surgeon who had operated on the prisoner); Tolbert v. Eyman, 434 F.2d 625 (9th Cir. 1970) (prison officials deny diabetic access to insulin); Edwards v. Duncan, 355 F.2d 993 (4th Cir.

DO NOT REMOVE FROM LIBRARY

§ 4.2                           RIGHTS OF PRISONERS, FOURTH EDITION

establish a violation. First, an "accident, although it may produce added anguish, is not, on that basis alone, to be characterized as wanton infliction of unnecessary pain. Thus, infliction of pain is not sufficient by itself to establish a violation." Second, "an inadvertent failure to provide adequate medical care" or "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . medical malpractice does not become a constitutional violation merely because the victim is a prisoner." The Court applied this last example in denying relief to Gamble, holding that the "question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment."

Since Estelle, the Supreme Court has provided some additional guidance concerning facts that would establish a violation. In Carlson v. Green, both parties agreed that a violation would be established if plaintiff could prove her allegations that the prison had inadequate facilities for treating her son's asthma, that he was kept in the facility despite the advice of doctors, that there was a delay of eight hours before treating him after he had an asthma attack, that "contraindicated drugs" were administered, that a respirator known to be inoperative was used, and that there was a

---

1966) (alleged denial of medical care for heart condition recognized doctor).

[14] Estelle v. Gamble, 429 U.S. 97, 105, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

[15] Wilson v. Seiter, 501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991). See also Snipes v. DeTella, 95 F.3d 586 (7th Cir. 1996) (holding that a physician's failure to anesthetize an inmate's finger before removing toenail did not constitute cruel and unusual punishment). Thus, an injury does not constitute a violation . . . It is equally true that, "an error . . . to inflict unnecessary pain is not required." Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986).

[16] Estelle v. Gamble, 429 U.S. 97, 105–6, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); Jones v. Hannigan, 959 F. Supp. 1400 (D. Kan. 1997); Cooper v. Mann, 906 F. Supp. 1025 (E.D. Va. 1995) (holding that prison physician was not deliberately indifferent to inmate's medical condition where physician ordered tests which were less efficient in detecting spinal cancer than a MRI).

[17] Carlson v. Green, 446 U.S. 14, 100 S. Ct. 1468, 64 L. Ed. 2d 251 (1980).

[18] 429 U.S. at 107.

446

---

§ 4.2                           MEDICAL CARE                           § 4.2

delay in transferring him to an outside hospital, all of which caused his death.

More recently, the Court has emphasized that the Estelle standard does include a "subjective, state-of-mind requirement." "[T]he requirement of 'wantonness,'" the Court held, "is an essential element of the Eighth Amendment, though in the context of the 'state's responsibility to attend the medical needs of prisoners.' 'Deliberate indifference' would constitute wantonness." The Court also rejected any notion that a different standard would apply when the violations were "continuing" or "systemic." Thus, the same "deliberate indifference" standard must be met in class action challenges to medical care systems as in individual cases.

The "deliberate indifference" portion of the Estelle standard is similar to the "deliberate indifference" required for other Eighth Amendment violations, discussed in prior cases.

---

[19] 446 U.S. at 16 n.1, 17 n.3.

[20] Wilson v. Seiter, 501 U.S. 294, 111 S. Ct. 2321, 2331, 115 L. Ed. 2d 271 (1991); Helling v. McKinney, 509 U.S. 25, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993); McCray v. First State Medical System, 379 F. Supp. 2d 635 (D. Del. 2005) (granting defendant healthcare provider's motion to dismiss where plaintiff diabetic inmate alleged defendant was deliberately indifferent to his medical needs when he was transferred to another prison facility for an intravenous injection resulting in a two hour delay in the administration of the procedure. Court held that plaintiff's complaint failed to state a claim because the defendant did not know that the plaintiff would be transferred for the procedure); Martinez v. Frank, 397 F. Supp. 2d 1059 (W.D. Wis. 2005) (dismissing plaintiff's claim that official denial of weight-training equipment represented an Eighth Amendment violation. Plaintiff did not allege that officials knew he needed to train on weights to keep his legs from atrophying due to severe arthritis and other ailments; therefore, they could not have proceeded with deliberate indifference. Plaintiff's claim that prisoners also failed because officials endeavored to make clear that prisoners with medical need would be accommodated, despite restricted access. However, a triable issue existed as to whether defendant medic denied arthritic plaintiff the use of leather wrist restraints during transit out of valid concerns or in order to cause plaintiff pain).

[21] 111 S. Ct. 2321 (quoting Whitley v. Albers, 475 U.S. 312, 320, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)).

[22] 111 S. Ct. at 2330.

447

DO NOT REMOVE FROM LIBRARY

The following pages are from my medical file at the LaSalle County Jail. The nurses and Dr. have clearly annotated "flat affect" and "thought disorder" all throughout my records. A person who presents with a flat affect is generally assumed to be suffering from some sort of mental health problem. A flat affect isn't normal. It is so far out of the ordinary that even the nurses who have no special training or knowledge about psychiatric disorders know that it isn't normal and have found it significant enough to mark it down in my records.

This goes to further show deliberate indifference and wantonness. They know something is wrong and still choose to do nothing about it.

# Appendix C

# Glossary of Technical Terms

A pattern of observable behaviors that is the expression of a subjectively experienced feeling state (emotion). Common examples of affect are sadness, elation, and anger. In contrast to *mood,* which refers to a more pervasive and sustained emotional "climate," *affect* refers to more fluctuating changes in emotional "weather." What is considered the normal range of the expression of affect varies considerably, both within and among different cultures. Disturbances in affect include

> **blunted** Significant reduction in the intensity of emotional expression.
> **flat** Absence or near absence of any signs of affective expression.
> **inappropriate** Discordance between affective expression and the content of speech or ideation.
> **labile** Abnormal variability in affect with repeated, rapid, and abrupt shifts in affective expression.
> **restricted or constricted** Mild reduction in the range and intensity of emotional expression.

**agitation (psychomotor agitation)** Excessive motor activity associated with a feeling of inner tension. The activity is usually nonproductive and repetitious and consists of such behavior as pacing, fidgeting, wringing of the hands, pulling of clothes, and inability to sit still.

**agonist medication** A chemical entity extrinsic to endogenously produced substances that acts on a receptor and is capable of producing the maximal effect that can be produced by stimulating that receptor. A **partial agonist** is capable only of producing less than the maximal effect even when given in a concentration sufficient to bind with all available receptors.

**agonist/antagonist medication** A chemical entity extrinsic to endogenously produced substances that acts on a family of receptors (such as mu, delta, and kappa opiate receptors) in such a fashion that it is an agonist or partial agonist on one type of receptor and an antagonist on another.

---

Glossary definitions were informed by the following sources: DSM-III; DSM-III-R; *American Psychiatric Glossary,* 6th Edition; *Penguin Dictionary of Psychology;* Campbell's *Psychiatric Dictionary,* 6th Edition; *Stedman's Medical Dictionary,* 19th Edition; *Dorland's Illustrated Medical Dictionary,* 25th Edition; and *Webster's Third New International Dictionary.*

**alogia**   An impoverishment in thinking that is inferred from observing speech and language behavior. There may be brief and concrete replies to questions and restriction in the amount of spontaneous speech (*poverty of speech*). Sometimes the speech is adequate in amount but conveys little information because it is overconcrete, over-abstract, repetitive, or stereotyped (*poverty of content*).

**amnesia**   Loss of memory. Types of amnesia include

> **anterograde**   Loss of memory of events that occur after the onset of the etio-logical condition or agent.
> **retrograde**   Loss of memory of events that occurred before the onset of the eti-ological condition or agent.

**antagonist medication**   A chemical entity extrinsic to endogenously produced sub-stances that occupies a receptor, produces no physiologic effects, and prevents en-dogenous and exogenous chemicals from producing an effect on that receptor.

**anxiety**   The apprehensive anticipation of future danger or misfortune accompanied by a feeling of dysphoria or somatic symptoms of tension. The focus of anticipated danger may be internal or external.

**aphasia**   An impairment in the understanding or transmission of ideas by language in any of its forms—reading, writing, or speaking—that is due to injury or disease of the brain centers involved in language.

**aphonia**   An inability to produce speech sounds that require the use of the larynx that is not due to a lesion in the central nervous system.

**ataxia**   Partial or complete loss of coordination of voluntary muscular movement.

**attention**   The ability to focus in a sustained manner on a particular stimulus or ac-tivity. A disturbance in attention may be manifested by easy distractibility or difficul-ty in finishing tasks or in concentrating on work.

**avolition**   An inability to initiate and persist in goal-directed activities. When severe enough to be considered pathological, avolition is pervasive and prevents the person from completing many different types of activities (e.g., work, intellectual pursuits, self-care).

**catalepsy**   Waxy flexibility—rigid maintenance of a body position over an extended period of time.

**cataplexy**   Episodes of sudden bilateral loss of muscle tone resulting in the individ-ual collapsing, often in association with intense emotions such as laughter, anger, fear, or surprise.

**catatonic behavior**   Marked motor abnormalities including *motoric immobility* (i.e., catalepsy or stupor), certain types of *excessive motor activity* (apparently purposeless

## MEDICAL PROGRESS NOTES

NAME _Spaulin Justin_     D.O.B _8·7·79_    ID NUMBER _____

| DATE/TIME | SOA | PLAN |
|---|---|---|
| | **MD NOTE:** | |
| | **S/ INMATE COMPLAINING OF:** | P/ |
| 1515 100/70 66 14 | ~~Anterior~~ ⌐ Pods Wrtd. ⍺ AO ⨯ 4 | |
| | ~~[illegible]~~ able to walk. | ~~[illegible]~~ po BID ⨯ 20 d |
| | 9/18/08 the Dr. finally examines me after I wrote the 2 grievances. He marks down in the records "Anxious, flat affect, and thought disorder." So he knows I suffer from mental health problems yet refuses to provide any treatment other than this 20 day supply of Liberal. | |
| | | **MD SIGNATURE:** ~~[illegible]~~ [signature] |
| | A/ ~~[illegible]~~ | **ORDERS TAKEN OF BY:** [illegible] |

## ~~COUNTY JAIL~~
## MEDICAL PROGRESS NOTES

INMATE'S NAME: SPARLIN, JUAN     D.O.B. 8/7/79

| DATE / TIME | SOA | PLAN |
|---|---|---|
| Cont. | A ×4, good eye contact. Denies any suicidal thoughts at this time States "disappointed with my public defender he didn't even help my case." Thought Disorder. | (P) Inmate placed in Medical isolation in booking cell for observation. — N. Resendez |
| 3·3·09 750 | S) Med Iso O) A ×4. Good eye contact. Reads newspaper. Denies any suicidal thoughts. ~~~~ Answers questions at this time looks down to paper. A) Med Iso | (P) Cont med Iso for observat. — N.Ann |
| 3/3/09 2020 | (S) Med Iso (O) A ×4 Good eye contact. ~~~~ Denies suicidal thoughts at this time Condition stable (A) Med Iso | (P) Cont. Med Iso — N. Resendez |
| 3/4/09 | (S) Sleeping (O) Allowed to Sleep. No distress (A) Condition Unchanged Safety Maintained | (P) Continue to Monitor in Med Iso for safety. (E) Unable to instruct the pt the Sleeping Block |

## LASALLE COUNTY JAIL
### MEDICAL PROGRESS NOTES

INMATE'S NAME: Sparlin Justin     D.O.B. 8-7-79

| DATE / TIME | SOA | PLAN |
|---|---|---|
| 3/6/09 2020 | S. med iso O- A&O x4. No clos hierral, no distress. Condition unchanged. A. Med iso — | R- cont. med iso E- Instructed [illegible] method of [illegible] — N. Resendez |
| 3/7/09 0200 | S. med iso O- Asleep, NO distress A. Med iso. | R- cont med iso E- unable to instruct N. Resendez |
| 3-7-09 800 | S) med iso O- Arouse [illegible] no s/s [illegible] - Cell check [illegible] our officers outward. A) Med iso | P) cont med iso E- [illegible] [illegible] |
| 3/8/09 0200 | S) med iso. O) Asleep. O) Distress. A) med iso. | P) cont med iso E) unable to instruct. D. Lapinski |
| 3-8-09 800 | S) med iso O) Arouse. Denies thoughts of suicide. No distress. Good eye contact. Speech clear. "I'm ok wirth it" when discussing count of plea bar-gain. I M lying flat on Bunk. A) med iso | P) [illegible] med iso Remains in med iso E) report to medical staff any signs of hurting self or others or needs to talk to med. [signature] |
| 3/8/09 2035 | S) O O) lep ad lib in cell. Offers no complaints. Good eye contact. A) med psol. | P) cont. med isol. E) Notify staff if any chg. or probs. M. B. Engel RN |

tions of extreme social isolation and reduced environmental stimulation" are likely to cause "some degree of psychological trauma upon most inmates confined there for more than brief periods," this kind of "generalized psychological pain" is not sufficient to show an Eighth Amendment violation.[5] Thus, even when conditions "press the outer boundaries of what humans can psychologically tolerate," restrictive confinement is not unconstitutional unless it can be demonstrated that there is a high risk that inmates exposed to these conditions will develop serious mental illness.[6] In the second case, the district court dealt with conditions in a

[... footnote text obscured ...] 889 F. Supp. at 1265.

[?] 889 F. Supp. at 1265 (holding that the conditions did not violate constitutional rights of inmates who did not suffer mental illness but [... obscured ...] for inmates who [... obscured ...] failed to state cruel and unusual punishment claim against prison officials arising from alleged confinement for 385 days in "keplock," absent specific allegations of serious deprivation rather than general allegations of "emotional and psychological trauma").

[?] 889 F. Supp. at 1267. Thus, one commentator noted that "the emotional consequences of isolation play a minor role in determining whether a constitutional violation exists." Maria A. Luise, Solitary Confinement: Legal and Psychological Considerations, 15 New Eng. J. Crim. & Civ. Confinement 301, 317 (1989). See also Jason Sandrin, Farmer v. Brennan: Do Prisoners Have Any Rights Left Under the Eighth Amendment, 16 Whittier L. Rev. 1113, 1145 (1995) (suggesting that courts are hesitant to consider psychological implications of solitary confinement).

But see Ruiz v. Johnson, 37 F. Supp. 2d 855, 914 (S.D. Tex. 1999), rev'd on other grounds and remanded, 243 F.3d 941 (5th Cir. 2001) [... obscured ...] that extreme levels of psychological [... obscured ...] to

supermax facility in Wisconsin and reached a similar decision on a motion for a preliminary injunction.[6] In some units of that facility, inmates were held in almost total sensory deprivation . . . kept confined alone in their cells for all but four hours a week. The exercise cell is devoid of equipment. The constant illumination is disorienting, as is the difficulty in knowing the time of day. The vestibule architecture and solid boxcar doors prevent any incidental interaction between inmates and guards . . .[7]

Scarver v. Litscher is a third case.[8] That case is discussed in Chapter 4 as well as here. In that case the Court noted that subjecting a mentally ill inmate to abject confinement, marked by "constant [... obscured ...] might permanently 'lead' to a 'kind of psychological harm' [... obscured ...] acts of self-harm."[?] Finally, in another case discussed in Chapter 4 Disability Advocates,

[... footnote text obscured ...]

[?] Jones 'El v. Berge, 164 F. Supp. 2d 1096 (W.D. Wis. 2001).

[?] 164 F. Supp. 2d at 1096.

[?] Scarver v. Litscher, 317 F. Supp. 2d 1082 (W.D. Wis. 2005), aff'd 434 F.3d 972 (7th Cir. 2006) [... obscured ...]

[?] 317 F. Supp. 2d at 1003. See also Walker v. State, 2008 MT 134, 316 Mont. 103, 68 P.3d 872 (2003) (violation where rather than providing treatment to inmates following his disruptive behavior and multiple suicide attempts, prison officials took away his mattress, pillow and all personal items including clothing and forced him to sleep naked on concrete slab in filthy cell); Clark-Murphy v. Foreback, 439 F.3d 280, 2005 FED App. 0047P (6th Cir. 2006) (inmate was deprived of water and psychological services while confined in an observation cell for five days during a time when temperatures were above 85 degrees and the inmate subsequently died from dehydration); McCray v. Burrell, 516 F.2d 357 (4th Cir. 1975) (conditions of isolation cells); Johnson v. Levine, 588 F.2d 1378 (4th Cir. 1978); Stuart Grassian, Psychiatric Effects of Solitary Confinement, 22 J. L. & Politics 325 (2006) (discussing solitary confinement in American prisons and its effect on the mental health of inmates); National Commission on Correctional Health Care, Standards for Health Services in Jails J-26 (2008); Commission on Accreditation for Corre-

§ 8:20

Thus, under the Supreme Court's analysis in *Wilson v. Seiter*,[5] no Eighth Amendment violation arises unless the court can determine that the subjective branch of the Eighth Amendment has been satisfied.[6]

However, this is more an academic problem than a real one. Since the threat to health is so readily apparent in segregation and since conditions that fall below the levels of human decency are likely to be well known to prison officials, such conditions constitute deliberate indifference and, thereby, are "punishment." It would be ironic if the law were otherwise. If it were, prisoners convicted of serious violations of institutional rules could challenge harsh conditions in a segregation unit on cruel and unusual punishment grounds, but inmates confined for observation, or self-protection could not, despite the fact (actually, because of the fact) that they have committed no rule infraction.[8]

The deprivation of some entitlements for inmates in segregation may raise distinct constitutional issues other than those under the Eighth Amendment. For example, deprivation of visiting or mail privileges to inmates in solitary confinement raises First Amendment issues, and denial of access to the law library raises questions dealing with the right of access to the courts. Those important issues are discussed separately in the chapters of this text dealing with those topics.[9]

without a hearing did not violate prisoner's due process rights, as sheriff was advancing "jail security" and was not attempting to punish inmate).

[5]*Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991), discussed in § 3:6.

[6]See § 3:6.

[7]See, e.g., *Young v. Quinlan*, 960 F.2d 351, 22 Fed. R. Serv. 3d 530 (3d Cir. 1992); *Henderson v. DeRobertis*, 940 F.2d 1055 (7th Cir. 1991). But see *Lovins v. Wright*, 423 F. Supp. 357 (D. Utah 1976) (holding that conditions in isolation unit for observation, classification, or protection of an inmate from harm were not punishment, because they were not intended as punishment).

[8]Another way to avoid this questionable result would be to allow the challenge to conditions in administrative segregation units to proceed on an equal protection basis. For a discussion of equal protection in prison, see Ch. 5. See also *Madden v. Kemna*, 739 F. Supp. 1358 (W.D. Mo. 1990).

[9]See §§ 12:15, 12:17, 12:26 to 12:28, 14:11.

§ 8:21

## § 8:21 Super-maximum security and mentally ill inmates

### Research References

West's Key Number Digest, Prisons ⊂=230; Sentencing and Punishment ⊂=1553

Relief, Under Federal Civil Rights Acts, to State Prisoners Complaining of Conditions Relating to Corporal Punishment, Punitive Segregation, or Other Similar Physical Disciplinary Measures, 18 A.L.R. Fed. 7

Pettigrew, Technology and the Eighth Amendment: The Problem of Supermax Prisons, 4 N.C. J. L. & Tech. 191 (Fall, 2002)

Rainer, Eighth Amendment-Gaps: Can Conditions of Confinement Litigation Benefit from Proportionality Theory?, 36 Fordham Urb. L.J. 53 (January, 2009)

Strassburger, Judicial Inaction and Cruel and Unusual Punishment: Are Super-Maximum Walls Too High for the Eighth Amendment?, 11 Temp. Pol. & Civ. Rts. L. Rev. 199 (Fall, 2001)

Increasingly, courts have been called upon to adjudicate the propriety of imposing isolation on mentally ill inmates. Three cases have issued sweeping opinions regarding this topic, and another case resulting in an historic settlement.[1] In the first case, the district court held that while "condi-

[Section 3:21]

[1]*Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995). The case dealt with conditions at the Pelican Bay State Prison, a correctional facility located in northwest California. The facility was a "state-of-the-art prison" housing between 3,500 and 3,900 inmates at a time, a maximum security facility of 2,000 "general population" inmates, and a Security Housing Unit (SHU) reserved for 1,000 to 1,500 inmates who allegedly posed serious disciplinary problems such as gang activity. Inmates in this last category were restricted to windowless cells with no exercise, recreational or work opportunities. The court found that the conditions were especially severe in the SHU. Inmates were incarcerated in windowless drab rooms, ate their meals by themselves in their cells, and were not exposed to any form of human contact. Indeed, the SHU was constructed with the idea of providing as little human contact as possible. These conditions did not apply to living conditions only, but also applied to medical and mental health care. The court also found that the conditions were exacerbated, for mentally ill inmates, by the lack of psychiatric care. The court found that the conditions were constitutional. The severity of the cruelty conditions in the SHU caused many mentally ill inmates to deteriorate. However, prisoners' rights provided few mental health services for these inmates. Moreover, the court found that placement in the unit created a risk that social activity and human psychological condition-known as Reduced Environmental Stimulation (RES) results in semi-fatuous

LASALLE - **COUNTY JAIL**
**MEDICAL PROGRESS NOTES**

INMATE'S NAME: Sparlin, Justin          D.O.B. 8·7·79

| DATE / TIME | SOA | PLAN |
|---|---|---|
| 3/4/09 2010 | (S) Med Iso (O) A+0x4 No C/o's suicidal, Denies Any suicidal thoughts at this time (A) Med Iso. | (P) Cont. Med Iso (E) Flm to notify Medical of Any Arising suicidal thoughts n. Rivendofn |
| 3/5/09 | (S) Med Iso (O) A+0x4 (P) Monitor in Vague. No C/o's. Med Iso R/t Safety Denies Suicidal (E) Informed that Ideation (A) thought to Infrequent Disorder R/T Conviction Ago of Med Iso Sy of thought Disorder — Blocha | (P) Monitor in Med Iso R/t Safety (E) |
| 3/5/09 | (S) ∅ (O) up ad lib in cell. offers no complaints. Alert + oriented to person, place + time. (A) Med Isol. | (P) cont med isol. (E) Notify medical if any probs. M.B. Engelen |
| 3/6/09 @ 750 | (S) Med Iso (O) A+0x4 No C/o's. No Distress Good Eye Contact. Walking in Cell. Calm + Cooperative (A) Hx of Conviction | (P) Cont Med Iso for Safety Watch (E) Informed Staff of any thought Disorder that Arises occur — Blocha |

## MEDICAL PROGRESS NOTES

NAME Sparlin, Justin          D.O.B 8/7/79          ID NUMBER _____

| DATE/TIME | SOA | PLAN |
|---|---|---|
| | Claims anm. MD NOTE: Cxxie sino | |
| | S/ INMATE COMPLAINING OF: INTAKE | P/ |
| 1050 | 512 c/o long standing dental problem. Inmate to answer | |
| 120/74 | α AO x 4 | |
| 72/20 | | |
| | | Sleep / Posture sheet |
| Numerous caries | | |
| | 3x caries | |
| | | MD SIGNATURE: |
| | non-acutely non-urgent | |
| | N POUF oral hygiene | ORDERS TAKEN OF BY: M. Rosenson |
| | Again on 02/12/09 the Dr. annotates in the records "Anxiety" yet refuses me treatment. | |

more than the assertion that "sore feet" or a split lip, swollen cheek, are not serious medical needs, but that broken bones are, or that serious medical needs are different from "minor injuries."

F.2d 860 (3d Cir. 1981) (alcoholism not serious); Shaw v. Jones, [?] App. 486, 344 S.E.2d 321 (1986) (overweight not serious).

For a sampling of cases holding conditions to be serious, see DeLoria v. Angelone, 330 F.3d 630 (4th Cir. 2003) (inmate's [?] against continued self-mutilation was serious medical [?]; Green v. Mazzone, 2002 WL 1636709 (D.N.J. 2002) (severe arthritic condition in prisoner's knees); Darnell v. Simmons, 30 Kan. App. 2d [?] P.3d 1278 (2002) (prisoner's medical complaints regarding lump [?] abdomen, stomach pains, and bloody stool); Davidson v. Scully, [?] Supp. 2d 77 (S.D. N.Y. 2001) (pediatric condition could constitute s[?]ous medical need); Jones v. Natesha, 151 F. Supp. 2d 938 (N.D. Ill. [?] (hemorrhoid condition was a serious medical need, where hemorrho[?] were serious enough to lead physician to perform three surgerie[?] two years); Johnson v. Wright, 234 F. Supp. 2d 352 (S.D. N.Y. [?] (Hepatitis C); Cooke v. Purdue, 421 F. Supp. 2d 1201 (E.D. Wash [?] (holding "that a tooth extraction is a serious medical event, espec[?] in this case, when the patient requires sutures or stitches"); U.S. v. C[?]les, 436 F.3d 560 (5th Cir. 2006) (broken neck); Davis v. Carter, 45[?] 686 (7th Cir. 2006) (withdrawal from methadone); Pimentel v. Deb[?] F. Supp. 2d 118 (D. Conn. 2006) (ignoring an inmate's complaint of [?] like symptoms amounted to deliberate indifference to a serious med[?] need); Gordon ex rel. Gordon v. Frank, 454 F.3d 858 (8th Cir. 2006[?] risk for cardiac failure resulting in death); O'Malley v. Litscher, 465 [?] 799 (7th Cir. 2006) (The restrained inmate was forced to lay unclo[?] vomit for several hours, resulting in rash to his skin.); Oxendine v. Ka[?] 241 F.3d 1272 (10th Cir. 2001) (gangrene); Gutierrez v. Peters, 111[?] 1364 (7th Cir. 1997) (inmate's infected cyst); Cameron v. Sarraf [?] Supp. 2d 906 (E.D. Va. 2000), aff'd, 232 F.3d 886 (4th Cir. 2000) (deg[?]tive disc condition); De La Paz v. Peters, 959 F. Supp. 909 (N.D. Ill. 1[?] (incontinence); Arnold on Behalf of H.B. v. Lewis, 803 F. Supp. 246 [?] (D. Ariz. 1992) (schizophrenia); Smith v. County of Dadd, 28 Nat'l P[?]ity Law Rep. P 55, 2004 WL 868278 (E.D. Pa. 2004) (cancerous [?] growth); Streeter v. Goord, 519 F. Supp. 2d 289 (N.D. N.Y. 2004) (sickle [?] cell anemia); Calhoun v. Volusia County, 499 F. Supp. 2d 1299 (M.D. [?] 2007) (gall bladder disease).

Lomholt v. Holder, 287 F.3d 683 (8th Cir. 2002).

Pinkston v. Madry, 440 F.3d 879 (7th Cir. 2006).

Brown v. Hughes, 894 F.2d 1533, 16 Fed. R. Serv. 3d 118 (11th [?] 1990).

Brownell v. Figel, 950 F.2d 1285, 1291 (7th Cir. 1991); Gill [?] Pidlypchak, 389 F.3d 379 (2d Cir. 2004) (plaintiff's claim that defend[?] exposed him to second hand smoke was too minor to succeed on an Eighth Amendment claim); Kelley v. Hicks, 400 F.3d 1282 (11th Cir. 2005[?]

---

Other courts, however, have attempted to further define [?] medical need," and their definitions to provide some additional and important guidance. For example, a condition may not be life threatening to be deemed serious [?] this have been held to evidence a serious medical need:

(a) "The one that has been diagnosed by a physician as mandating treatment."

(b) "If it is [?] would [?] recognize the necessity for a doctor's attention."

(plaintiff failed to show that defendant intentionally permitted violations of no smoking policy, that prison had inadequate ventilation, or that defendant was deliberately indifferent to his healthcare needs and future suffering); Gaard, 123 Fed. Appx. 441 (2d Cir. 2005) (plaintiffs claimed that conditions at the prison's print shop were hazardous to their health. Court held that since the plaintiffs chose to work in the print shop and were aware of possible health risks, there was no constitutional violation, particularly where injuries were only minor physical reactions like headaches, nausea, and skin irritations.); Revels v. Vincenz, 382 F.3d 870 (8th Cir. 2004) (plaintiff alleged that medical staff refused to allow him to use the bathroom and retaliated against him for filing grievances. Court held that defendants did not prohibit plaintiff from using the bathroom for a prolonged period of time and did not act with deliberate indifference towards the plaintiff's health.); see also Powell v. Cusimano, 326 F. Supp. 2d 322 (D. Conn. 2004) (plaintiff claimed that guards made homophobic comments, forcibly removed plaintiff's hair extensions, strip searched plaintiff and used excessive force but failed to show that defendant was deliberately indifferent to his medical need.).

Washington v. Dugger, 860 F.2d 1018 (11th Cir. 1988); Lozman v. Hdgemee, 437 F. Supp. 269, 311 (D.N.H 1977) ("Even elective treatment recommended by a physician but not 'necessary' in life or health, saving sense, may be constitutionally mandated upon a prisoner's election.")

Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1187 (11th Cir. 1994); Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990). See also Johnson v. Wright, 412 F.3d 398 (2d Cir. 2005) (prescribed Hepatitis C drug regimen); Lindsey v. Brady, 537 F. Supp. 2d 666 (D. Del. 2008) (claim of deliberate indifference failed, as the nurse only informed official that prisoner's asthma "could" worsen or become "potentially" life threatening, "thus stating a mere possibility that harm will occur, not an inevitability. Furthermore, inmate failed to establish that he had a serious medical need because inmate was not suffering from severe symptoms or an attack at the time breathing treatment was denied.). But see Shabazz v. Barnauskas, 790 F.2d 1536, 1538 (11th Cir. 1986).

Alsina-Ortiz v. Laboy, 400 F.3d 77 (1st Cir. 2005) (half-paralyzed from a brain injury is obvious medical need); Pool v. Sebastian County, Ark., 418 F.3d 934 (8th Cir. 2005) (plaintiff who suffered a miscarriage

DO NOT REMOVE FROM LIBRARY

§ 4:4    RIGHTS OF PRISONERS, FOURTH EDITION

(4) If the medical condition significantly affects an inmate's daily activities; or [redacted]

(5) If the condition offers the possibility of a life-long handicap or permanent loss, it may be considered serious.[11]

was in so much pain from cramping that she was unable to perform routine daily functions.); *Greeno v. Litscher*, 13 Fed. Appx. 870 (7th Cir. 2001) (layperson should be able to ascertain that an inmate had a serious medical problem when he constantly complained of serious stomach pains and often vomited); *Sanderson v. Friedman*, 2000 WL 1721052 (N.D. Cal. 2000) (any reasonable person should know that inmate who was suffering from numerous serious health conditions, including cancer, and enduring side effects had serious medical needs); *Johnson v. Pearson*, 316 F. Supp. 2d 307 (E.D. Va. 2004) (reasonable person would have known there was constitutional violations where plaintiff with respiratory conditions was housed with a cell mate who smoked); *Layman ex rel. Layman v. Alexander*, 343 F. Supp. 2d 488 (W.D. N.C. 2004) (defendants failed to follow proper procedure when they failed to provide inmate with medical attention as directed after he hit his head and suffered brain damage).

[11]*Cooper v. Casey*, 97 F.3d 914, 916–17 (7th Cir. 1996) (holding that pain from beating constituted serious medical need); *Boretti v. Wiscomb*, 930 F.2d 1150, 1155 (6th Cir. 1991) (medical care... *East v. Lemons*, 768 F.2d 1000 (8th Cir. 1985) (leg cramps); *Wright v. Dee*, 54 F. Supp. 2d 199 (S.D. N.Y. 1999) (pain from beating); *Fortuna v. Chief of Police*... (medical need, or risk to health"); *Stevens v. Gress*, 2008 (S.D. N.Y. 2008) (inmate suffered from a variety of muscular dystrophy and alleged that the refusal to allow him to see a muscular dystrophy specialist and failure to renew his prescriptions in a timely fashion, inter alia, ultimately led to extreme pain, suffering, emotional distress, and permanent injury); *Smith v. County of Los Angeles*, 535 F. Supp. 2d 1033 (C.D. Cal. 2008) (failure to provide an inhaler led to prolonged suffering before death). But see *Givens v. Jones*, 900 F.2d 1229, 1233 (8th Cir. 1990) (one month of pain insufficient); *Wynn v. Mundo*, 367 F. Supp. 2d 832 (M.D. N.C. 2005), aff'd, 142 Fed. Appx. 193 (4th Cir. 2005) (discomfort from flu-like symptoms of fever, aching body, and chills did not constitute a serious medical need).

*Long v. Nix*, 86 F.3d 761 (8th Cir. 1996) (inmate suffering for years from dysphoria, a gender identity disorder); *Kosilek v. Maloney*, 221 F. Supp. 2d 156 (D. Mass. 2002) (life-long handicap or permanent loss of vision); *Scott v. Garcia*, 370 F. Supp. 2d 1056 (S.D. Cal. 2005) (severe gastrointestinal condition interfered with ability to eat normally).

[12]*Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347, 90 A.L.R. Fed. 631 (3d Cir. 1987) (life-long handicap or permanent loss is "serious medical need"); *Layman ex rel. Layman v. Alexander*, 343 F. Supp. 2d 488 (W.D. N.C. 2004) (defendants failed

---

MEDICAL CARE    § 4:5

The seriousness of the medical need cannot be judged with the benefit of hindsight. Thus, the relevant facts are those known at the time of the incident. Officials will not be held liable for conditions that appeared innocuous but turned out to be serious. Conversely, prison officials will be held liable for conditions that appeared serious even if they did not ultimately turn out to be so.[14] In addition, inmates need not wait until harm occurs for a court to find that serious needs are unmet.[15]

## II. MEDICAL SCREENINGS AND EXAMINATIONS

### § 4:5 Initial screening when entering facility

**Research References**

West's Key Number Digest, Prisons ⚖190, 192; Sentencing and Punishment ⚖1546

Robbins, Prisoners and the Law § 1B-19

A wide variety of cases have challenged the failure of an institution to engage in medical screening of inmates on their arrival at the institution.[1] Virtually all of those cases have held that an adequate medical system must include a

provide arrestee with medical attention as directed after he hit his head and he suffered brain damage as a result).

[14]*Davis v. Jones*, 936 F.2d 971 (7th Cir. 1991) (police must offer medical care to pretrial detainee whenever jail authorities have reason to suspect that injury is serious, whether or not problem turns out to be serious after further investigation, whether injury is obvious or a question left to physician); *Boretti v. Wiscomb*, 930 F.2d 1150 (6th Cir. 1991). But see *McCray v. Williams*, 357 F. Supp. 2d 774 (D. Del. 2005) (holding in dicta that plaintiff failed to allege any actual injury from a botched attempt to insert an IV in the prison infirmary and subsequent transfer to a hospital for treatment. Plaintiff merely claimed he could have gone into diabetic shock or coma as a result of the delay).

[15]*Helling v. McKinney*, 509 U.S. 25, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993); *Laxman v. Helgemoe*, 437 F. Supp. 269, 312 (D.N.H. 1977). For a general discussion of the concept of "serious medical need", see Michael C. Friedman, Comment, Cruel and Unusual Punishment in the Provision of Prison Medical Care: Challenging the Deliberate Indifference Standard, 45 Vand. L. Rev. 921 (1992).

[Section 4:5]

[1]*Lareau v. Manson*, 651 F.2d 96, 109 (2d Cir. 1981); *Monmouth County Correctional Institution Inmates v. Lanzaro*, 595 F. Supp. 1417, 1422 (D.N.J. 1984), order modified, 695 F. Supp. 759 (D.N.J. 1988), opinion amended, 717 F. Supp. 268 (D.N.J. 1989; *Cody v. Hillard*, 599 F. Supp.

DO NOT REMOVE FROM LIBRARY

ion" that the ~~inmate~~ ~~~~ prohibited by the Eighth Amendment could involve physical ~~~~ ~~~~ The ~~~~ of ~~~~ review ~~make~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~ the ~~direct~~ effect ~~~~ decide in ~~Hutto~~, which ~~~~ not ~~open up opportunities to~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~ inmate ~~~~ ~~~~ clear. What is more, in a prison setting, where prison officials have such total control over inmates, the potential for the infliction of severe psychological harm is quite real. To fence out psychological pain from Eighth Amendment protection would be to open up opportunities to maltreat inmates without constitutional review." These ~~~~ lower courts have interpreted the Supreme Court's rulings ~~~~ ~~~~ ~~~~ and ~~Hutto~~ ~~~~ ~~~~ ~~the proposition~~ that ~~~~ ~~~~ ~~~~
While there is general agreement among the lower courts on

[20]112 S. Ct. at 1004 (Blackmun, J., concurring).

[21]Solitary confinement, for example, is a device that is fraught with dangers of psychological injury. In this regard Eighth Amendment litigation has had a great deal of impact in setting limits on how solitary confinement can operate. See § § 3:17 to 3:21.

[22]See, e.g., *Jordan v. Gardner*, 986 F.2d 1521 (9th Cir. 1993) (en banc) (holding that severe psychological pain can violate the Eighth Amendment); *Northington v. Jackson*, 973 F.2d 1518, 23 Fed. R. Serv. 3d 984 (10th Cir. 1992) (holding that placing a revolver to a prisoner's head within justification is actionable infliction of "psychological injury"); *Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991) (holding that statement of inmate that "I'm sure I was depressed from it" was sufficient to state a claim for violation of the Eighth Amendment standards for prison conditions); *Babcock v. White*, 102 F.3d 267, 273 (7th Cir. 1996) (observing that "the Constitution does not countenance psychological torture merely because it fails to inflict physical injury"); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (holding that a "significant . . . emotional injury" can constitute Eighth Amendment pain; citation and internal quotation marks omitted); *Hobbs v. Lockhart*, 46 F.3d 864, 873 Fed. R. Serv. 3d 380 (8th Cir. 1995) (ruling that allegations of severe emotional distress, shame and anxiety, and fears stated a constitutionally cognizable claim); *Thomas v. Farley*, 31 F.3d 557, 559 (7th Cir. 1994) ("Mental torture is not an oxymoron, and has been held or assumed by the prisoner cases . . . to be actionable as cruel and unusual punishment."); *Strickler v. Waters*, 989 F.2d 1375 (4th Cir. 1993) (observing that in unusual instances an emotional injury "would be cognizable under the Eighth Amendment"); *Scher v. Engelke*, 943 F.2d 921, 924 (8th Cir. 1991) (ruling that "fear, mental anguish, and misery" can cause sufficient pain to violate the Eighth Amendment; *White v. Napoleon*, 897 F.2d 103, 111 (3d Cir. 1990) (ruling that "allegations [of mental anxiety] are sufficient to state a claim under

this general principal, there is a split in authority on the question of whether a damage award can be imposed when the only injury suffered is psychological.[23] These issues are discussed in greater detail in the sections that follow.[24]

In the final analysis, it is extremely difficult to discuss in the abstract the meaning and parameters of the cruel and unusual punishment clause. Concrete factual situations must be examined, and many of the more common of these will be explored in the subsequent sections, but first the subjective component of the Eighth Amendment must be explored.

§ 3:12    The subjective component: what is punishment?

**Research References**

West's Key Number Digest, Prisons ⟣120, 123, 192; Sentencing and Punishment ⟣1430, 1436
Genty, Confining Punishment with Custodial Care: The Troublesome Legacy of Estelle v. Gamble, 21 Vt. L. Rev. 379 (Winter, 1996)
Landry, "Punishment" and the Eighth Amendment, 57 Ohio St. L.J. 1607 (1996).

the Eighth Amendment"); *Delaney v. DeTella*, 256 F.3d 679 (7th Cir. 2001) (claim can be based on the presence of a "strong likelihood" of psychological damage due to the denial of exercise privileges for 90 days); *Benefield v. McDowall*, 241 F.3d 1267 (10th Cir. 2001) (the pervasiveness of psychological injury is taken into account in proving substantial risk of serious harm); *Chandler v. District of Columbia Dept. of Corrections*, 145 F.3d 1355 (D.C. Cir. 1998) (a claim of psychological injury to a verbal threat may be sufficient to implicate the Eighth Amendment); *Wilson v. Silcox*, 151 F. Supp. 2d 1345 (N.D. Fla. 2001) (verbal threats can lead to an Eighth Amendment claim for psychological injury).

[23]Contrast e.g., *Doe v. Welborn*, 110 F.3d 520, 523–24 (7th Cir. 1997), as amended, (May 29, 1997) and *Babcock v. White*, 102 F.3d 267, 272–273 (7th Cir. 1996), holding that damages cannot be awarded for psychological fear caused by living in fear of other inmates, with *Benefield v. McDowall*, 241 F.3d 1267, 1272 (10th Cir. 2001), holding that damages could be awarded for this injury.

[24]See § § 3:24 to 3:30. The impact of the Prison Reform Litigation Act's prohibition on suits not based on physical injury on this branch of the law is discussed in that section.

## Diagnostic criteria for 298.8 Brief Psychotic Disorder

A. Presence of one (or more) of the following symptoms:

   (1) delusions

   (2) hallucinations

   (3) disorganized speech (e.g., frequent derailment or incoherence)

   (4) grossly disorganized or catatonic behavior

**Note:** Do not include a symptom if it is a culturally sanctioned response pattern.

B. Duration of an episode of the disturbance is at least 1 day but less than 1 month, with eventual full return to premorbid level of functioning.

C. The disturbance is not better accounted for by a Mood Disorder With Psychotic Features, Schizoaffective Disorder, or Schizophrenia and is not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general medical condition.

*Specify* if:

   **With Marked Stressor(s)** (brief reactive psychosis):  if symptoms occur shortly after and apparently in response to events that, singly or together, would be markedly stressful to almost anyone in similar circumstances in the person's culture

   **Without Marked Stressor(s):**  if psychotic symptoms do not occur shortly after, or are not apparently in response to events that, singly or together, would be markedly stressful to almost anyone in similar circumstances in the person's culture

   **With Postpartum Onset:**  if onset within 4 weeks postpartum

## Criteria for Panic Attack

**Note:** A Panic Attack is not a codable disorder. Code the specific diagnosis in which the Panic Attack occurs (e.g., 300.21 Panic Disorder With Agoraphobia [p. 441]).

A discrete period of intense fear or discomfort, in which four (or more) of the following symptoms developed abruptly and reached a peak within 10 minutes:

   (1) palpitations, pounding heart, or accelerated heart rate

   (2) sweating

   (3) trembling or shaking

   (4) sensations of shortness of breath or smothering

   (5) feeling of choking

   (6) chest pain or discomfort

   (7) nausea or abdominal distress

   (8) feeling dizzy, unsteady, lightheaded, or faint

   (9) derealization (feelings of unreality) or depersonalization (being detached from oneself)

   (10) fear of losing control or going crazy

   (11) fear of dying

   (12) paresthesias (numbness or tingling sensations)

   (13) chills or hot flushes